

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-17-2000

# Berg v. Allegheny Cty

Precedential or Non-Precedential:

Docket 98-3557

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Berg v. Allegheny Cty" (2000). *2000 Decisions.* Paper 145.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/145

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 17, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-3557

RAYMOND A. BERG, JR.,
        Appellant

v.

COUNTY OF ALLEGHENY;
ALLEGHENY COUNTY ADULT PROBATION SERVICES;
DEBBIE BENTON; RICHARD R. GARDNER;
GLENN ALLEN WOLFGANG; GINNY DEMKO

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. Civil Action No. 97-cv-00928
(Honorable Donetta W. Ambrose)

Argued March 10, 1999

Before: MANSMANN, SCIRICA and NYGAARD,
Circuit Judges

(Filed July 17, 2000)

        THEODORE E. BREAULT, ESQUIRE
         (ARGUED)
        Breault & Associates
        428 Forbes Avenue
        2200 Lawyers Building
        Pittsburgh, Pennsylvania 15219

         Attorney for Appellant

ERIC N. ANDERSON, ESQUIRE
  (ARGUED)
Meyer, Darragh, Buckler, Bebenek
 & Eck
2000 The Frick Building
Pittsburgh, Pennsylvania 15219

 Attorney for Appellees,
County of Allegheny, Allegheny
County Adult Probation Services,
Debbie Benton, Richard R.
Gardner, Ginny Demko

AUDREY J. COPELAND, ESQUIRE
  (ARGUED)
Marshall, Dennehey, Warner,
Coleman & Goggin
1845 Walnut Street
Philadelphia, Pennsylvania 19103

SCOTT G. DUNLOP, ESQUIRE
Marshall, Dennehey, Warner,
Coleman & Goggin
2900 USX Tower
600 Grant Street
Pittsburgh, Pennsylvania 15219

 Attorneys for Appellee,
Glenn Allen Wolfgang

OPINION OF THE COURT

PER CURIAM.

Plaintiff Raymond Berg appeals the District Court's grant of summary judgment to all defendants in this civil rights action alleging false arrest and imprisonment based on an erroneously issued warrant. We will affirm in part and reverse in part.

I. Background

On July 14, 1994, Richard Gardner, the supervisor at Allegheny County Adult Probation Services, requested an

2

arrest warrant for Paul Banks, who had violated conditions of his parole. After a judge of the Court of Common Pleas approved the warrant, Gardner sent an Arrest Warrant Information Sheet to Virginia Demko, the warrant clerk responsible for issuing and clearing all arrest warrants in Allegheny County. The Information Sheet listed Banks's name, offense, date of birth, criminal complaint number, Social Security number, and address. On August 3, 1994, Demko generated the warrant using the County's computerized Integrated Court Information System (ICIS). ICIS is operated by typing a criminal complaint number into the computer, which automatically retrieves the remaining information and displays it on the user's screen.

Unfortunately, Demko transposed two digits in Banks' criminal complaint number. As a result, she entered the criminal complaint number of plaintiff, Raymond A. Berg, Jr., who three years earlier had completed a six-month parole term for driving under the influence. Demko's computer screen displayed Berg's name, date of birth, criminal complaint number, Social Security number, and address, all of which were different from the information on the Arrest Warrant Information Sheet. Berg concedes, however, that Demko noticed only that the address on the screen was different from the address on the Information Sheet. See Appellant's Br. at 7. She did not realize that the other information was different as well. See id.

Concluding that the ICIS contained an old or otherwise incorrect address for Banks, Demko manually changed the information in the ICIS. She replaced Berg's address, in Sewickley, Pennsylvania, with Banks's last known address, listed on the Information Sheet, in Finleyville, Pennsylvania. That was the only change she made.

Demko then generated the warrant for Berg's arrest and sent it to the Allegheny County Sheriff 's Office. Gardner's name and telephone number were written on the warrant as the contact person from whom additional information could be obtained. Demko also returned the Information Sheet requesting the Banks warrant to Gardner after date-stamping it to indicate that the warrant had been issued. Thus, because of Demko's clerical error, and her subsequent decision to change the information contained in

3

the ICIS, an arrest warrant was issued for Berg rather than Banks. Demko later testified in her deposition that, in issuing over 500 warrants per month since 1989,"this is the only occasion where this has ever occurred."

In reviewing Banks' case on August 16, 1994, Gardner noticed that the Information Sheet had been stamped (indicating the issuance of a warrant) but, according to his review of ICIS, no warrant in fact existed. Gardner admits that, "for a brief moment," he may have considered the possibility that an erroneous warrant was issued, but would have quickly realized that there was no practical way to determine whether one had. See Gardner Dep. at 141:16 through 142:3 (A.397-98). He then called Demko, informed her that no warrant had been issued for Banks, and requested that she issue one. Nothing in the record indicates that Gardner suggested to Demko, at that time, that she may have processed an erroneous warrant.

Berg's warrant was executed on the night of December 30, 1994, by Glenn Allen Wolfgang, an elected constable in Westmoreland County. Wolfgang, who earned a fee for each person arrested, frequently executed outstanding arrest warrants for Allegheny County, and on December 30 he planned to make four arrests. Before leaving home, Wolfgang retrieved Berg's address and telephone number using a computer software/on-line system he had purchased from a credit union. Apparently, however, he did not notice that the address he retrieved, and the one listed on the warrant for Berg's arrest, were different. He proceeded instead to the Finleyville address listed on the warrant, only to discover that it was an abandoned house. Wolfgang then telephoned Berg and asked for directions to his house. Wolfgang called three or four more times for further directions and took over an hour to drive from Finleyville to Berg's house. In his deposition, Wolfgang described Berg as "[v]ery cooperative" on the telephone.

When Wolfgang arrived, Berg was entertaining guests at his house at a pre-New Year's Eve party. Berg informed Wolfgang that he had never lived in Finleyville and offered to produce release documents proving that he was no longer on parole. After confirming that Berg's birthday and social security number were the same as those on the

4

warrant, Wolfgang refused to look at the release documents, instead telling Berg to bring them with him. Berg did show Wolfgang his driver's license, confirming that Berg was no longer on parole.1 But Wolfgang simply told Berg not to take too much time retrieving the release documents because he had three more people to arrest that night.

Wolfgang did call the Allegheny County Sheriff 's Office, but after being told that the warrant was still"active," he arrested Berg. Wolfgang did not try to call Gardner. Gardner testified that if Wolfgang had called and asked him about a warrant for Berg's arrest, Gardner would have checked Berg's file and told Wolfgang not to arrest Berg.

At the Sheriff 's office, Berg was strip-searched, fingerprinted, inoculated, and placed in the Allegheny County Jail. Because Probation Services and the courts were closed for the holidays, Berg remained in jail until January 3, 1995, or approximately five days. Finally, after intervention by Berg's attorney, Demko issued a Notification to Clear the Warrant and Berg was released.

Berg filed suit against Allegheny County, Gardner, Demko, and Wolfgang in Pennsylvania state court, alleging civil rights violations under 42 U.S.C. SS 1983, 1985(3), 1988 (1994), and the Fourth, Fifth, and Fourteenth Amendments.2 The defendants removed the case to the District Court for the Western District of Pennsylvania and, following discovery, moved for summary judgment. The District Court granted summary judgment to all defendants, ruling that Berg's arrest was not unconstitutional because the facially valid warrant gave Wolfgang probable cause for the arrest.

_____

1. In his deposition, Wolfgang acknowledged knowing that during "the penalty phase" of a DUI sentence a defendant must surrender his driver's license.

2. Berg also sued his former parole officer, Debbie Benton, and Allegheny County Adult Probation Services. Benton was dismissed with Berg's consent when it became clear that she was not involved in his arrest. The District Court dismissed the Probation Services office, concluding the office is an arm of the County without distinct legal existence. See Berg v. County of Allegheny, No. 97-928, slip op. at 4 n.2 (W.D. Pa. Sep. 23, 1998). Berg does not challenge this determination on appeal.

## II. Legal/Analytical Framework

On appeal, Berg presses only his S 1983 claim. 3 To make a prima facie case under S 1983, the plaintiff must demonstrate that a person acting under color of law deprived him of a federal right. See Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). Here, it is undisputed that defendants were acting under color of law when they issued and executed the warrant for Berg's arrest.

The next step is to "identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998). Section 1983 is not a source of substantive rights and does not provide redress for common law torts--the plaintiff must allege a violation of a federal right. See Baker v. McCollan, 443 U.S. 137, 146 (1979). Berg alleges he was subjected to false arrest, false imprisonment, and denial of due process in violation of 42 U.S.C. SS 1983 and 1985(3), and the Fourth, Fifth, and Fourteenth Amendments.

The Supreme Court has held that when government behavior is governed by a specific constitutional amendment, due process analysis is inappropriate. Although not all actions by police officers are governed by the Fourth Amendment, see Lewis at 842-43 (noting that accidents during police chases are not "covered" by the Fourth Amendment), the constitutionality of arrests by state officials is governed by the Fourth Amendment rather than due process analysis. See id.; United States v. Lanier, 520 U.S. 259, 272 n.7 (1997); Graham v. Connor , 490 U.S. 386, 394 (1989); Blackwell v. Barton, 34 F.3d 298, 302 (5th Cir. 1994). Therefore, we will limit our analysis of Berg's arrest to his Fourth Amendment claim. See Baker , 443 U.S.

_____

3. 42 U.S.C. S 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to
> the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for
> redress.

6

at 142–43 (1979) (interpreting S 1983 false imprisonment claim as grounded in Fourth Amendment rights); Groman, 47 F.3d at 636 (same). Although we recognize the possibility that some false arrest claims might be subject to a due process analysis, we also conclude that this record could not support a due process claim.

Our analysis of Berg's Fourth Amendment claim is a three-step process. First, we must determine whether he was seized for Fourth Amendment purposes. If so, we next determine whether that seizure violated the Fourth Amendment's prohibition against unreasonable seizures. Finally, if there has been a Fourth Amendment violation, we must determine which of the defendants, if any, may be held liable for it.

III. Fourth Amendment Seizures

A person is seized for Fourth Amendment purposes only if he is detained by means intentionally applied to terminate his freedom of movement. A seizure occurs even when an unintended person is the object of detention, so long as the means of detention are intentionally applied to that person. See Brower v. County of Inyo, 489 U.S. 593, 596 (1989) (citing Hill v. California, 401 U.S. 797, 802–05 (1971)); see also Medeiros v. O'Connell, 150 F.3d 164, 169 (2d Cir. 1998); Rucker v. Harford County, 946 F.2d 278, 281 (4th Cir. 1991), cert. denied, 502 U.S. 1097 (1992); Landol–Rivera v. Cruz Cosme, 906 F.2d 791, 796 (1st Cir. 1990).

For example, if a police officer fires his gun at a fleeing robbery suspect and the bullet inadvertently strikes an innocent bystander, there has been no Fourth Amendment seizure. See Medeiros, 150 F.3d at 168–69; Rucker, 946 F.2d at 281; Landol–Rivera, 906 F.2d at 795. If, on the other hand, the officer fires his gun directly at the innocent bystander in the mistaken belief that the bystander is the robber, then a Fourth Amendment seizure has occurred. See Brower, 489 U.S. at 596 (citing Hill v. California, 401 U.S. 797, 802–05 (1971)).

Applying that law to these facts, there is no doubt that Berg's arrest constituted a seizure for Fourth Amendment

7

purposes. Even if Wolfgang had thought he was arresting Banks, his intentional application of control over the person of Berg would be a Fourth Amendment seizure. Here, however, Wolfgang knew he was arresting Berg rather than Banks, and clearly intended to do so, even though motivated by an erroneous warrant. The question, then, is whether the arrest violated the Fourth Amendment.

The Fourth Amendment prohibits arrests without probable cause. See Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995). As previously noted, the District Court concluded that the warrant for Berg's arrest was facially valid and that it therefore supplied probable cause to arrest him. See Berg v. County of Allegheny, No. 97-928, slip op. at 4-7 (W.D. Pa. Sept. 22, 1998) (Wolfgang); Berg v. County of Allegheny, No. 97-928, slip op. at 4-5 (W.D. Pa. Sept. 23, 1998) (remaining defendants). We cannot agree.

The Supreme Court's decision in Whiteley v. Warden, 401 U.S. 560 (1971), as well as our own subsequent decisions, make clear that an erroneously issued warrant cannot provide probable cause for an arrest. In Whiteley, a county sheriff obtained a warrant for Whiteley's arrest based on a conclusory complaint. Police officers in another jurisdiction arrested Whiteley, discovering evidence later introduced at his trial. The state argued that because the arresting officers were unaware of the defect in the warrant, they had probable cause to arrest whether or not the sheriff did. But the Supreme Court held that the arrest was unconstitutional and ordered the evidence excluded:

> Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

Id. at 568. As in Whiteley, Constable Wolfgang relied on an arrest warrant, assuming it had been issued after

8

presentation to a judge of evidence sufficient to establish probable cause.4 Also as in Whiteley, "the contrary turn[ed] out to be true"; neither Gardner, Demko, nor anyone else associated with the creation of the warrant had probable cause to arrest Berg.

In United States v. Hensley, 469 U.S. 221 (1985), the Court, relying primarily on Whiteley, held that police may conduct a Terry stop based on a flyer issued by other officers, but "[i]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." Id. at 232. In Arizona v. Evans, 514 U.S. 1 (1995), the Court held that the policies underlying the exclusionary rule do not require suppression of evidence seized pursuant to an erroneous warrant resulting from a clerical error. But the Court also noted that Whiteley "clearly retains relevance in determining whether police officers have violated the Fourth Amendment." Id. at 13. Thus, the Supreme Court has made clear that a mistakenly issued or executed warrant cannot provide probable cause for an arrest.

Our cases have applied the same principle. In Rogers v. Powell, 120 F.3d 446 (3d Cir. 1997), a county probation officer told one state trooper that a second state trooper had reported that a warrant existed for Roger's arrest. Relying on the probation officer's representation that a warrant existed, the first state trooper arrested Rogers the

_____

4. The Court of Appeals for the Second Circuit, without discussion of Whiteley, has upheld an arrest based on a warrant later found to have been improperly issued. See United States v. Towne, 870 F.2d 880, 884–85 (2d Cir. 1989), cert. denied, 490 U.S. 1101 (1989); see also United States v. Shareef, 100 F.3d 1491, 1505 (10th Cir. 1996) (upholding the constitutionality of a Terry stop based on good–faith reliance on inaccurate information provided by other law enforcement officials); United States v. De Leon–Reyna, 930 F.2d 396, 401 (5th Cir. 1991) (en banc) (per curiam) (same). Other courts, relying on Whiteley, have continued to hold that an improperly issued warrant cannot provide probable cause for an arrest. See United States v. Meade, 110 F.3d 190, 193–94 & 194 n.2 (1st Cir. 1997); Ott v. State , 600 A.2d 111, 115 (Md. 1992); State v. Taylor, 621 A.2d 1252, 1254 (R.I. 1993). The Supreme Court's subsequent decisions, as well as our own, convince us that Whiteley remains the governing law.

9

following day. In fact, however, there was no such warrant and Rogers filed a S 1983 action for violation of his Fourth and Fourteenth Amendment rights.

Like defendants here, the Rogers defendants argued that the arresting officer's "mistaken belief that an arrest warrant had issued for Rogers supplied the probable cause required by the Fourth Amendment." Id. at 452–53. We rejected this argument, holding that "[t]he legality of a seizure based solely on statements issued by fellow officers depends on whether the officers who issued the statements possessed the requisite basis to seize the suspect." Id. at 453 (citing Hensley, 469 U.S. at 231). Because "neither [the trooper] nor [the probation officer] had knowledge of the requisite facts and circumstances necessary to support a finding of probable cause," we concluded the arrest violated the Fourth Amendment. Id. We similarly rejected the argument that reliance on a mistakenly issued warrant can supply probable cause in United States v. Miles , 468 F.2d 482, 487–88 (3d Cir. 1972), and United States v. Bianco, 189 F.2d 716, 719 (3d Cir. 1951).

The only potentially distinguishing feature of Berg's arrest is that the mistake here was made by a court clerk, rather than a police officer. We do not believe this distinction is significant, however. The Fourth Amendment provides: "[N]o Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. Because the courts are the arm of government charged with issuing warrants, we believe this requirement is directed to court officials as well as law enforcement officers. This reading is supported by the case law. In Arizona v. Evans, the Supreme Court did not find it significant that the unlawful arrest was occasioned by the mistake of court clerk, as opposed to a police officer. See 514 U.S. at 13–15. 5 Similarly, in Rogers, the arresting officers relied on a probation officer's

_____

5. The Court did recognize that court personnel are not "adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime" and therefore application of the exclusionary rule is unlikely to alter their behavior. Id. at 15. But this determination is not relevant to an assessment of whether their mistakes can provide probable cause for an arrest.

statement that another trooper had said a warrant existed for Rogers' arrest, yet we held the arrest unconstitutional without inquiring whether the mistake was the trooper's or the probation officer's. See 120 F.3d at 452-55; see also Murray v. City of Chicago, 634 F.2d 365, 366 (7th Cir. 1980) (holding that although it was unclear whether the police department or clerk's office had failed to transmit an order quashing a warrant, "[i]t seems clear that [plaintiff] sustained a violation of constitutional rights by being arrested and detained pursuant to an invalid warrant").

Because the government officials who issued the warrant here did not have probable cause to arrest Berg, the arrest violated the Fourth Amendment. Accordingly, summary judgment should not have been granted based on the existence of the warrant.6

_____

6. Unlike defendants, we do not read Baker v. McCollan, 443 U.S. 137 (1979) to hold otherwise. When he was arrested, McCollan's brother claimed to be McCollan, presenting McCollan's identification. After his brother violated parole, McCollan was arrested on a warrant and spent a long New Year's weekend in jail. The Court found no constitutional violation, but the substance of McCollan's claim was different from Berg's:

> [R]espondent makes clear that his S 1983 claim was based solely on Sheriff Baker's actions after respondent was incarcerated . . . .
>
>  . . . Absent an attack on the validity of the warrant under which he was arrested, respondent's complaint is simply that despite his protests of mistaken identity, he was detained [over the long weekend]. Whatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution.

Id. at 143-44. Unlike McCollan, Berg challenges the generation and execution of the warrant for his arrest, not the decision to incarcerate him after arrest. At issue here is not whether authorities must investigate the claims of innocence of a person who has been legally arrested but what precautions the Constitution requires before an arrest warrant is issued and executed. See Murray, 634 F.2d at 367 (distinguishing Baker on the same ground).

11

IV. Liability of the Individual Defendants

Absent immunity or an adequate defense, a person who, acting under color of state law, directly and intentionally applies the means by which another is seized in violation of the Fourth Amendment can be held liable under S 1983. As a general rule, a government official's liability for causing an arrest is the same as for carrying it out. See Gordon v. Degelmann, 29 F.3d 295, 298 (7th Cir. 1994); see also Kilborn v. Thompson, 103 U.S. 168, 200 (1880) (holding that legislators directing an arrest are as responsible as those who effected arrest). As the Supreme Court has explained, S 1983 anticipates that an individual will be "responsible for the natural consequences of his actions." Malley v. Briggs, 475 U.S. 335, 344 n.7 (1986) (holding that a police officer who obtains an arrest warrant without probable cause is liable under S 1983 even though another officer made the actual arrest). It is thus clear that S 1983 liability for an unlawful arrest can extend beyond the arresting officer to other officials whose intentional actions set the arresting officer in motion. We turn, then, to the issue of which, if any, of the defendants in this case can be held liable for Berg's unconstitutional arrest.

A. Constable Wolfgang

Constable Wolfgang contends that he is entitled to qualified immunity from suit because he executed a facially valid warrant. Unless historical facts are in dispute, qualified immunity is a matter for the court. See id. at 828. The inquiry is an objective one; the arresting officer's subjective beliefs about the existence of probable cause are not relevant. See Anderson v. Creighton, 483 U.S. 635, 641 (1987). In considering claims of qualified immunity, courts are sensitive to "[t]he broad range of reasonable professional judgment accorded" law enforcement officials in the S 1983 context. Greene v. Reeves , 80 F.3d 1101, 1107 (6th Cir. 1996). Thus, "the qualified immunity doctrine `gives ample room for mistaken judgments' by protecting `all but the plainly incompetent or those who knowingly violate the law.' " Orsatti, 71 F.3d at 484 (quoting Malley v. Briggs, 475 U.S. 335, 345 (1986)).

12

A government official is entitled to qualified immunity if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In the context of this case, the question is whether "a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir. 1997) (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam); Anderson v. Creighton, 483 U.S. 635, 641 (1987). Our inquiry, then, has two parts. Did Wolfgang's conduct violate clearly established law? If so, did he nevertheless reasonably believe that his conduct was lawful in light of the information he possessed at the time?

At the time of Berg's arrest in 1994, it was clear that an arrest could be made only with probable cause. Although Rogers was decided in 1997, Whiteley clearly established in 1971 the conditions under which an arresting officer can obtain probable cause from a warrant. As we have already noted, the warrant at issue in this case did not provide probable cause to arrest Berg. Therefore, we must consider whether a reasonable constable in Wolfgang's position could have concluded that there was probable cause to arrest Berg based on the information Wolfgang had at the time.

Ordinarily, it is reasonable for an officer to assume that a warrant has been issued for probable cause. As the Supreme Court explained in Baker,

> Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.

443 U.S. at 145-46. Therefore, we have generally extended immunity to an officer who makes an arrest based on an objectively reasonable belief that there is a valid warrant. See Rogers, 120 F.3d at 456 (concluding that a state

13

trooper who was inaccurately told by another trooper that there was a warrant for the plaintiff 's arrest was immune from suit); Capone v. Marinelli, 868 F.2d 102, 105–06 (3d Cir. 1989) (holding that arresting officers were immune in light of a bulletin correctly reporting the existence of an arrest warrant "as well as the nature of the alleged offenses [including child kidnaping] and the fact that a young child was in possible danger"); cf. Groman v. Township of Manalapan, 47 F.3d 628, 635 n.10 (3d Cir. 1995) (affirming summary judgment in favor of officers who arrested plaintiff after being told by another officer that plaintiff had assaulted her). Other courts of appeals have adopted the same rule. See Pickens v. Hollowell, 59 F.3d 1203, 1207–08 (11th Cir. 1995); Salmon v. Schwartz, 948 F.2d 1131, 1140–41 (10th Cir. 1991); Bennett v. City of Grand Prairie, Tex., 883 F.2d 400, 408 (5th Cir. 1989); Barr v. Abrams, 810 F.2d 358, 362 (2d Cir. 1987). But see Ruehman v. Sheahan, 34 F.3d 525, 527 (7th Cir. 1994) (dicta) (questioning whether officers who arrested plaintiff based on an inaccurate computer report of an outstanding warrant were protected by qualified immunity).

Nevertheless, an apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the relevant circumstances. Such circumstances include, but are not limited to, other information that the officer possesses or to which he has reasonable access, and whether failing to make an immediate arrest creates a public threat or danger of flight. See Malley, 475 U.S. at 345 (holding that where a police office submits an affidavit in support of a warrant request, and a reviewing magistrate's concludes that the affidavit establishes probable cause, the officer is not immune from a S 1983 lawsuit if "a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause . . . ."); see also Yancey v. Carroll County, 876 F.2d 1238, 1243 (6th Cir. 1989) (holding that "[p]olice officers are entitled to rely on a judicially secured warrant for immunity from a S 1983 action for illegal search and seizure unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable.").

14

At the summary judgment stage here, Berg submitted a report from Alan Springer, a Pennsylvania Constable, who concluded "it was not objectively reasonable for Mr. Wolfgang to believe that probable cause existed for the arrest of Mr. Berg" under the circumstances. According to Springer, the relevant circumstances included the age of the warrant, the invalid address, Berg's socio-economic status, Berg's documentation that he had completed his probation, Berg's cooperativeness, the fact that Berg had a driver's license despite allegedly being on parole for DUI, the fact that Berg did not flee or ask his guests to leave despite having ample warning of Wolfgang's arrival, and the nonviolent nature of the crime. Springer stated that Wolfgang should have waited until the probation office re-opened on January 3, 1995 so he could look into Berg's claims. He also opined that Wolfgang had been "predisposed to arrest Mr. Berg" to earn his fee, particularly after such a large investment of time.

We think Springer's report raises valid questions concerning the reasonableness of Wolfgang's conduct in this case. Because the District Court concluded that Berg's arrest had not been unconstitutional, it did not reach Wolfgang's qualified immunity claim. Consequently, it did not make the findings of fact necessary to determine, as a mater of law, whether Wolfgang's reliance on the warrant was unreasonable under the circumstances with which he was confronted. Therefore, we will remand the cause so that the District Court can make the necessary findings, and can consider the qualified immunity issue in the first instance.

B. Demko

To avoid summary judgment under a Fourth Amendment analysis, Berg must point to some evidence from which a reasonable jury could conclude that Demko intentionally caused his arrest. He has failed to do so. In fact, Berg concedes that Demko failed to notice that her computer screen displayed his name, rather than Banks', when she mistakenly transposed the criminal complaint number on the Warrant Information Request Sheet. See Appellant's Br. at 7 ("She also failed to note that all of the other

15

information on her computer screen, i.e. the arrestee's name, his date of birth, his criminal complaint number, his social security number and the reason for his arrest, was also incorrect."). Nevertheless, Berg contends that Demko could be held liable under a due process theory of deliberate indifference.

Where a defendant does not intentionally cause the plaintiff to be seized, but is nonetheless responsible for the seizure, it may be that a due process "deliberate indifference" rather than a Fourth Amendment analysis is appropriate. See County of Sacramento v. Lewis , 523 U.S. 823, 843-44 (1998) (holding that if there is no seizure, the case is not covered by the Fourth Amendment and therefore due process analysis may be appropriate). We need not decide that here, however, because Berg has not alleged anything more than mere negligence on Demko's part. Negligence by public officials is not actionable as a due process violation. See Daniels v. Williams, 474 U.S. 327 (1986); Colburn v. Upper Darby Township, 946 F.2d 1017 (3d Cir. 1991). Whether or not she should have noticed the additional discrepancies between the information displayed on her computer screen and what appeared on the Information sheet, the fact remains that she did not.

Berg claims, however, that Demko acted with deliberate indifference because she failed to take any steps to recall the erroneously issued warrant when Gardner "informed her of [her mistake] on August 16, 1994." Appellant's Br. at 25. The record does not support Berg's argument. When Gardner called Demko on August 16, he merely informed her that no warrant for Banks had been issued. See Gardner Dep. at 116:9-14 (App. 372). He did not inform her that she had issued an erroneous warrant until approximately January 3, 1995, several days after Berg had been arrested. See Appellant's Br. at 11 (citing App. 603). By that time, it was obviously too late to recall the warrant before it was executed. There is nothing in the record indicating that Demko was aware of her error at any earlier date. She could not have been deliberately indifferent to a risk of which she was reasonably unaware. Therefore, we will affirm summary judgment in favor of Demko.

16

C. Gardner

As with Demko, Berg points to no record evidence that Gardner intentionally caused his arrest. Though Gardner initiated the series of events that ultimately led to Berg's arrest, his only role was to request a warrant for Banks. He played no part in issuing the erroneous warrant for Berg. Neither did he play any part in Wolfgang's execution of that warrant. In short, there is nothing in this record suggesting that Gardner ever intended to cause Berg's arrest. His only intention was to cause Banks' arrest.

By way of rough analogy, Gardner's warrant request is analogous to the stray bullets at issue in Medeiros, Rucker, and Landol-Rivera. Gardner "fired" the warrant at Banks, and it inadvertently "struck" Berg instead. This is not the intentional application of the means of detention required for a Fourth Amendment seizure.

Again, however, Berg argues that Gardner could be held liable under a due process theory of deliberate indifference. He contends that Gardner displayed such indifference when he failed "to act on his `hunch' that perhaps an erroneous warrant did, in fact, issue." Appellant's Br. at 8. It is worth noting, however, that the record does not establish any such "hunch" on Gardner's part. Asked at deposition to recall his thoughts on a particular day more than three years in the past, Gardner was only willing to assume that:

> based upon the way I try and perform my job, that it occurred to me that the warrant-- there was no warrant issued, that the warrant may have not taken in the computer or that there was a possibility that a bad warrant had been issued.

Gardner Dep. at 151:16-20 (A.407); see also id. at 140:4-8 (A.396).

Even assuming, for summary judgment purposes, that Gardner did realize a bad warrant may have issued, his uncontradicted testimony establishes that he believed there was simply no reasonable way to investigate his suspicion. While the term deliberate indifference is generally defined to require only knowledge of a serious risk of harm, see Fuentes v. Wagner, 206 F.3d 335, 345 n.12 (3d Cir. 2000)

17

(defining deliberate indifference in the context of a prisoner's Eighth Amendment claim), it also implies a failure to take reasonably available measures to reduce or eliminate that risk. See Farmer v. Brennan, 511 U.S. 825, 847 (1994) (holding that "a prison official may be held liable under the Eighth Amendment . . . only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.") (emphasis added). Where no reasonable measures exist, neither can deliberate indifference. As with Demko, we will affirm summary judgment in favor of Gardner.

V. Municipal Liability

Allegheny County cannot be held liable for the unconstitutional acts of its employees on a theory of respondeat superior. See Monell v. Department of Social Servs., 436 U.S. 658, 691 (1978). Instead, Berg must demonstrate that the violation of his rights was caused by either a policy or a custom of the municipality. See Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996).

Berg contends that he was arrested as a result of Allegheny County's "flawed warrant creation practice" and poor training procedures. As noted, the Integrated Court Information System generates a warrant based on a single datum -- the criminal complaint number of the person to be arrested. Because the user enters no other information, there is no check in the computer system to guard against the kind of mistake Demko made. Nor are there procedures that would allow a probation officer such as Gardner who suspects an error to confirm that suspicion. Theseflaws, Berg maintains, caused his unlawful arrest.

"Policy is made when a `decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembauer v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality opinion)) (alteration in original, other internal quotation marks omitted). Customs are " `practices of state officials . . . so permanent and well settled' as to

18

virtually constitute law." Id. (quoting Monell, 436 U.S. at 691) (other internal quotation marks omitted). Both Demko and Gardner made it clear that there is an established and predictable procedure for issuing warrants and the County has not claimed that the method used in Berg's case differed from any other -- apart from the obvious aberration. To the contrary, in its answer to the complaint, the County conceded that Demko "followed the practices and procedures which had been in effect at the time she started working." Answer, P 8. We believe it is a more than reasonable inference to suppose that a system responsible for issuing 6,000 warrants a year would be the product of a decision maker's action or acquiescence. See, e.g., Beck, 89 F.3d at 973 ("written complaints were sufficient for a reasonable jury to infer that Chief of Police of Pittsburgh and his department knew or should have known" of officer's violent behavior); Silva v. Worden, 130 F.3d 26, 31 (1st Cir. 1997) (stating custom is demonstrated by showing "practice is so well settled and widespread that the policymaking officials have either actual or constructive knowledge of it"). Thus, we hold that there is sufficient evidence that the procedure was a policy or custom of the County's.

Once a S 1983 plaintiff identifies a municipal policy or custom, he must "demonstrate that, through its deliberate conduct, the municipality was the `moving force' behind the injury alleged." Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997). If, as here, the policy or custom does not facially violate federal law, causation can be established only by "demonstrat[ing] that the municipal action was taken with `deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." Id. at 407 (citations omitted); see also City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989).

Failure to adequately screen or train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations. See Bryan County, 520 U.S. at 408-09. Although it is possible to maintain a claim of failure to train without demonstrating such a pattern, the Bryan County Court made clear that the burden on the plaintiff in such a case is high:

19

In leaving open in Canton the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice.

Id. at 409. The Court has stated that an example of deliberate indifference to an obvious risk is arming officers without training them "in the constitutional limitations on the use [of the arms.]" Canton, 489 U.S. at 390 n.10.

Berg contends the County is liable because of its failure to provide sufficient procedural or technical safeguards against errors such as the one that resulted in Berg's arrest. We have previously applied the Supreme Court's rulings in failure-to-train cases to other claims of liability through inaction, see, e.g., Beck, 89 F.3d at 972; Williams v. Borough of West Chester Pennsylvania, 891 F.2d 458, 467 n. 14 (3d Cir. 1989), and we do so here as well.

The record contains no evidence of procedures guarding against Demko's mistake. Expressing considerable knowledge of the warrant-issuing procedures, Gardner testified that he knew of no "double check" to ensure that warrants were issued in the correct name. Nor was Gardner aware of any procedure by which he could check to ascertain if an erroneous warrant had issued. Having employed a design where the slip of a finger could result in wrongful arrest and imprisonment, there remains an issue of fact whether the County was deliberately indifferent to an obvious risk. The County's failure to provide protective measures and failsafes against Demko's mistake seems comparable to "a failure to equip law enforcement officers with specific tools to handle recurring situations." Bryan County, 520 U.S. at 409. When such a simple mistake can

20

so obviously lead to a constitutional violation, we cannot hold that the municipality was not deliberately indifferent to the risk as a matter of law. Accordingly, the County may be liable under Monell.

We will reverse the District Court's grant of summary judgment to the County so that a fact finder may address these questions.7

VI. Future Violations

It is clear we have entered an age in which law enforcement personnel will rely increasingly on computer technology. Dissenting in Arizona v. Evans, Justice Ginsburg noted,

> Widespread reliance on computers to store and convey information generates, along with manifold benefits, new possibilities of error, due to both computer malfunctions and operator mistakes. . . . [C]omputerization greatly amplifies an error's effect, and correspondingly intensifies the need for prompt correction; for inaccurate data can infect not only one agency, but the many agencies that share access to the database.

514 U.S. at 26 (Ginsburg, J., dissenting). Similarly, Justice O'Connor emphasized,

> In recent years, we have witnessed the advent of powerful, computer-based recordkeeping systems that facilitate arrests in ways that have never before been possible. The police, of course, are entitled to enjoy the substantial advantages this technology confers. They may not, however, rely on it blindly. With the benefits of more efficient law enforcement mechanisms comes the burden of corresponding constitutional responsibilities.

_____

7. Demko and Gardner intended to arrest Banks. But the County intended that the individuals identified by the warrant-issuing system be arrested. In this case, the person was Berg. Thus the County intentionally seized Berg through means it intentionally applied.

21

Id. at 17–18 (O'Connor, J., concurring). We would add that widespread computerization carries with it the ability and responsibility to institute more effective safeguards against human error than existed in the past.

The Bryan County Court noted that no pattern of violations would be necessary to show deliberate indifference where it was obvious that a policy or custom would lead to constitutional violations. What is obvious in the field of technology is determined under an evolving standard. In this case, Allegheny County may have been liable for Raymond Berg's arrest through deliberate indifference to the obvious danger of such an arrest. Whether or not Allegheny County is ultimately found to have been deliberately indifferent in this case, this tragedy will never again be novel. Allegheny County is on notice of ICIS's shortcomings and at least one of the dangers of using compartmentalized computer systems without viable failsafes.

VII. Conclusions

For the reasons given, the judgment of the District Court will be affirmed as to Defendants Gardner and Demko and reversed as to Defendants Wolfgang and Allegheny County. We will remand for further proceedings consistent with this opinion.

22

MANSMANN, Circuit Judge, concurring in part and dissenting in part.

I respectfully concur in all parts of the court's opinion except Part IV. In Part IV, I differ only with respect to defendants Demko and Gardner, which the majority addresses in subparts B and C, respectively. I would reverse this portion of the District Court's summary judgment and remand because, in my view, there remains a genuine issue of material fact as to each of these defendants.

I take issue with the court's conclusion that Demko did not intend to cause Berg's seizure. First, Demko's state of mind at the time she processed the warrant is not clear on this record. Demko's statement that "Berg and Bank, I'm sorry, looked very close to me," could be read in two different ways. She could have meant that the name "Berg" looked so similar to the name "Banks" that she did not notice the wrong name was on the screen. Alternatively, she could have meant that she knew Berg's name appeared on the screen rather than Banks', but assumed the error was in the warrant request, not the computer system. In other words, Demko could have concluded that Gardner had intended to request a warrant for Berg, but inadvertently wrote down Banks' name instead. Thus, Demko's state of mind remains a jury question.

In addition, even if we assume that Demko did not notice discrepancies between the information displayed on the screen and what appeared on the information sheet at the time she typed in th